**James H. GANIER, Plaintiff-Appellee,**

v.

**CLAYTON BROKERAGE COMPANY OF ST. LOUIS, INC., Defendant-Appellant.**

Court of Appeals of Tennessee, Western Section.

Feb. 15, 1985.

Application for Permission to Appeal Denied by Supreme Court May 6, 1985.

John McQuiston, II, Memphis, for defendant-appellant.

Ira M. Thomas, Memphis, for plaintiff-appellee.

NEARN, Presiding Judge, Western Section.

This contract dispute arose from a move the plaintiff made while employed by the defendant, Clayton Brokerage Company. Clayton is a Missouri based brokerage firm with offices in several cities, including Memphis and Dallas. In the Spring of 1981, the plaintiff was branch manager of the Memphis office and was asked by the senior officers of the company to take over as branch manager of the Dallas office, the company's largest and most lucrative branch. After negotiations, the parties reduced to writing and signed a memoran-

dum of notes from their meetings. Paragraph 4 of this written memorandum, the interpretation of which is in dispute, is as follows:

4. In Jim Ganier's move from Memphis to Dallas, Clayton will pay his moving expense, pay the interest difference on his current mortgage vs. the interest on his new mortgage for the same amount of money as his Memphis mortgage and pay his closing cost. Clayton will help Jim get a $125,000 loan at a bank (second mortgage). Clayton will pay the interest on $100,000 for two years. This interest payment goes against the Dallas office P & L. If Jim doesn't have his house sold by the time he moves, Clayton will pay the interest on the swing loan and pay the Memphis mortgage.

After this memorandum was signed by the parties, Ganier moved to Dallas and worked for approximately a year and a half for Clayton. In November, 1982, for reasons not relevant to this lawsuit, Ganier's employment with Clayton ended. Just before Ganier closed the sale on his Dallas home, Clayton filed a *lis pendens* action in Texas state Court and was awarded a $53,-000 lien on the proceeds of the Dallas home sale representing a sum Clayton had paid earlier to Union Planters bank on a note signed by Ganier and guaranteed by Clayton. By written agreement of the parties, the lien was satisfied and Ganier reserved all rights to sue Clayton later for the amount paid. Ganier then filed this lawsuit in Shelby County, seeking reimbursement of the $53,000 from Clayton. The Trial Court awarded judgment for the entire amount to Ganier and Clayton has appealed.

On appeal, Clayton's position is that paragraph 4 quoted above was intended as a final and complete expression of the parties' agreement as to who would bear the costs of Ganier's move to Dallas, that the doctrine of merger and the parol evidence rule bar oral testimony to alter or vary the terms of paragraph 4 and that the Chancellor erred in allowing parol evidence regarding the parties' interpretation of the para-

graph. The plaintiff contends that the Chancellor was correct in allowing oral testimony to explain the terms of the paragraph, which Ganier contends is ambiguous.

■ The Chancellor, in admitting parol evidence regarding the parties' intent as to who was responsible for paying Union Planters the $53,000, must have concluded that the parties' written contract, specifically paragraph 4, was latently ambiguous, a conclusion that brings the admission of parol evidence within an exception to the general rule. *See Ward v. Berry & Associates, Inc.*, (1981 Tenn.App.M.S.) 614 S.W.2d 372, 374. We agree that paragraph 4 is ambiguous. The ambiguity arises, for example, where reference is made to "the swing loan," but no definition of that term is given. Also, in that same sentence, Clayton agrees to pay the Memphis mortgage. Whether this means that Clayton will pay the balance in full or make the monthly payments is unclear. Another sentence in the paragraph states that "Clayton will pay the interest on $100,000 for two years." What $100,000 this sentence refers to is unclear. Thus, the whole paragraph is so ambiguous that parol evidence is necessary to an understanding of what, on the whole, the parties mutually intended by these statements. "To the extent, if any, that any of the words is uncertain, then it is permissible to show by communications between the parties or other circumstances what the *mutual* intent of the parties was, not inconsistent with the words in question." (emphasis in original) *Ward*, 614 S.W.2d at 374.

■ Although at first blush, Ganier's oral testimony that Clayton was responsible for paying the principal of "the swing loan" seems inconsistent with the statement in paragraph 4 that "Clayton will pay the interest on the swing loan," his oral testimony regarding Clayton's responsibility for the principal of swing loan is not inconsistent with the statements in paragraph 4 when his testimony regarding what the swing loan represented is considered. Ganier testified that the swing

loan represented the amount of equity that Ganier thought he had in his Memphis home—$100,000—and that he thought he must clear from the sale of that home in order to afford a comparable home in the more expensive Dallas area. Ganier testified that in his negotiations with Clayton's officers he emphasized that he had no incentive to go to work in Dallas unless he could be guaranteed $100,000 out of his Memphis house. He also testified that the purpose of paragraph 4 was to set forth the manner in which he was guaranteed a "no loss" move.

Ganier's testimony is consistent with the manner in which the loan from Union Planters was obtained. Ganier signed a note for $100,000, and Clayton guaranteed the note. This loan enabled Ganier to have the use of his anticipated net profit from the Memphis house sale before the house had sold. Ganier's testimony is also consistent with the fact that Richard Wallace, the realtor who sold Ganier's Memphis home, dealt exclusively with Clayton's officers in negotiating a contract to sell the house for less than $225,000, the price at which the net profit would have been $100,000. Clayton's control over the selling price of the house makes sense, however, only if Clayton was the one that stood to bear the loss.

Apparently, none of the parties anticipated that the Memphis house would bring less than the $100,000 net profit. If the agreement was as Ganier testified, Clayton, in effect, guaranteed that Ganier's home would net him $100,000, the fact that it did not bring the contemplated profit does not eliminate the guarantee of a "no loss" move provided by Clayton in the memorandum. The obvious reason for the omission of any mention in the agreement that Clayton would pay the principal of the swing loan is that the parties thought that Ganier's Memphis home would net $100,000. Thus, the parties expected that the principal of the swing loan would be paid off with the proceeds from the sale and that Clayton would pay only the interest. However, if Clayton guaranteed a move at

no cost to Ganier, then Clayton is liable for the amount of the principal not covered by the proceeds of the sale as well as the interest that it agreed to pay.

Clayton's two witnesses, the company officers who negotiated the move to Dallas with Ganier, denied that they had agreed to bear any loss on the sale of Ganier's Memphis home. They argued that the memorandum was a complete and final expression of their agreement with Ganier, and yet, when questioned on cross-examination about the meaning of the terms of paragraph 4, each gave conflicting testimony and was unsure regarding the meaning of the terms. The Chancellor heard the testimony of the witnesses and found the agreement to be as Ganier had testified. The Chancellor's decision on the credibility of the witnesses is entitled to great weight and is binding on this Court unless from other real evidence we are compelled to conclude to the ˙contrary. *Hudson v. Capps*, (1983 Tenn.App.W.S.) 651 S.W.2d 243, 246. We find no other evidence to compel a conclusion contrary to the Chancellor's.

The result is that the judgment is affirmed. Costs are assessed against the appellant.

Done at Memphis in the two hundred and ninth year of our Independence and in the one hundred and eighty-ninth year of our Statehood.

TOMLIN and CRAWFORD, JJ., concur.